## Philadelphia Rapid Transit Company Underliers

MARGIOTTI, Attorney General, August 27, 1936.—This matter comes before us on the petition of Matthew H. McCloskey, Jr., praying that a suggestion for a writ of quo warranto be filed against 43 railway and traction companies known as the underliers of the Philadelphia Rapid

Transit Company. Answers admitting the material allegations of said petition were filed by or on behalf of all the companies named in the petition. Briefs were filed, and oral arguments later presented on behalf of the respective parties.

The ultimate question involved herein is whether these underlier corporations have failed to exercise or have abused the franchises conferred upon them by the legislature, and whether they have therefore forfeited these franchises.

The petition alleges that the named corporations exist merely for the purpose of collecting and disbursing as dividends rents upon leases of their franchises and properties.

These corporations rely mainly upon the Acts of March 22, 1887, P. L. 8, and May 15, 1895, P. L. 64, as authority for the leases herein involved. The Act of March 22, 1887, P. L. 8, entitled: "An act to provide for the incorporation and regulation of motor power companies for operating passenger railways by cables, electrical or other means", provides that such corporations shall have the power:

"To lease the property and franchises of passenger railway companies, which they may desire to operate, and to operate said railways."

The Act of May 15, 1895, P. L. 64, entitled: "An act authorizing traction or motor power companies to enter into contract with each other for the sale, lease and operation of their respective property and franchises", provides:

"That any traction or motor power company heretofore or hereafter incorporated under the laws of this Commonwealth is hereby authorized to sell or to lease, or to lease and to sell its property and franchises, as well those owned as those leased, operated or controlled by it, including so much of any line or lines of passenger railways owned, leased or controlled by it as is located upon street or streets, to any other traction or motor power

company incorporated under the laws of this Commonwealth, upon such terms as may be agreed upon. Such traction or motor power company may also enter into contracts with other traction or motor power companies incorporated under the laws of this Commonwealth for the operation of lines of railway and property owned, leased, operated or controlled by it: Provided, That nothing herein contained shall be construed as authorizing any traction or motor power company to acquire, lease or operate so much of the line of any other motor power company as occupies any township, borough or county road."

The petitioner claims that the agreements and leases, by virtue of which the Philadelphia Rapid Transit Company exercises the franchises of the underliers, were not in accordance with the spirit and intent of the acts cited; that they were mere devices for pyramiding of capital, schemes for earning an unfair return, and curtains behind which could be hidden a conspiracy to defraud the investing public and the car riders of Philadelphia.

If the leases were executed as, or later became, instruments for the perpetration of frauds and abuses, the privileges and powers conferred by the legislature upon these corporations have been forfeited.

In passing upon the question herein presented, it is the duty of the Attorney General to determine whether the petition presents a substantial question, and one of sufficient public interest to justify submission to a court of law for consideration and ultimate disposition.

In Welch's Petition, 18 D. & C. 23, 27, it was stated that in proceedings of the present nature the Attorney General of the Commonwealth has "simply to determine whether there is a substantial question affecting the public interest, which would warrant submission of the issue to a court of proper jurisdiction."

In the matter of the Application to the Attorney General for a writ of Quo Warranto against The Grant and Liberty Street Railway Co., Opinions of the Attorney Gen-

eral (1905-6) 358, the sole inquiry made by the then Attorney General was whether "these matters are proper subjects for a judicial inquiry."

After a careful examination of the pleadings, the exhibits and the briefs presented, we are convinced that the petitioner has presented such a case, and that the questions herein involved are of such moment to the public as to warrant further proceedings before a court of law.

The leases involved are all for the term of 999 years. Improvements apparently are the property of the lessor corporations, which become indebted to the lessees for the amount of the improvements; however, this indebtedness is placed into a "stated account", which is not to be settled until the termination of the lease, and upon which no interest is payable during the entire term of 999 years.

The leasing companies do not keep depreciation or obsolescence accounts, and do not provide adequate reserve for sinking fund requirements; nor do they provide for the retirement of obligations without sinking fund provisions. The effect of this method of bookkeeping is obvious, and must have been obvious to the directorates of the respective corporations. In a word, the bookkeeping systems permitted the companies to liquidate themselves and yet to continue charging the car-riding public for property which had long since been fully paid.

The lessee corporations pay the salaries, the counsel fees, etc., of the lessor corporations; and, by virtue of interlocking directorates, it is apparently impossible for one leasing party ever to occupy a position genuinely antagonistic to the other, notwithstanding adverse interests.

The rentals set forth in the leases are expressed as dividends on the stocks of the lessor corporations, and are set up as fixed charges against the property of the lessees. Although some of the lessor corporations were earning high dividends at the time the leases were created, other leases were created at a time when the lessors were unable to earn any dividends, and yet payments on the stocks of

these latter companies were also set up as fixed charges, in some instances even preferred to funded indebtedness.

The petitioner claims further, and the exhibits indicate, that vast mileage of abandoned tracks and thousands of pieces of unused rolling stock are carried upon the books as property and equipment merely for rate-making purposes. Asset accounts include nonexistent property for which the taxpayer and the car rider continue to pay.

The securities issued by many of the defendant corporations are based upon values which indicate inflation. The petitioner has reasonable basis for his claim that both in the exchange of securities and in the issuance thereof the many leasing parties intended the manipulation of stock values and imposition upon the public, rather than the execution of bona fide leases.

There is reasonable ground for the conclusion that the so-called leases were executed or performed merely as a cloak for manipulation and fraud. These underlier corporations should be stripped of the franchises which they have misused to the detriment of the public and in some instances failed to use at all for the public purpose of their incorporation. Innocent investors in underlier securities have a complete legal remedy in the courts.

The public duty owed by railway and traction companies is uppermost in my mind, in this decision that the courts should have an opportunity to act upon the present controversy. The first obligation of public service companies is to the public. The petitioner claims, and the facts reasonably warrant this claim, that only by completely ousting these corporations from their franchises can the public be at all benefited under the present state of circumstances.

This matter is of vital importance to the taxpayers of Philadelphia, to the car riders who use the facilities of the Philadelphia Rapid Transit Company and to the thousands of stockholders and other investors in its securities.

Many benefits would accrue from any decree of ouster which may be awarded by the courts in the present case.

The first will be the distribution of the earnings of the Philadelphia Rapid Transit Company among the thousands of poor, laboring, amateur investors in that company, rather than among the banking interests who control the stock of many of the underlier corporations and who are responsible for the present situation.

Another benefit flows from the first: that is, by restoring the earnings of the Philadelphia Rapid Transit Company to that corporation, its directors acquire the opportunity to exercise their discretion in applying such funds toward sorely needed improvements in service and toward a reduction of trolley fares. With improved service and reduced rates, earnings will be still further increased, eventually permitting a greater return to the thousands of the citizens of Philadelphia and to the thousands of employes of the Philadelphia Rapid Transit Company who, in good faith, invested their funds in the stock of that company.

Still another of the important benefits resulting from such action will be to free the Philadelphia Rapid Transit Company from underlier pressure and influence. It is a matter of common knowledge that the necessity of nourishing the underlier parasites has dominated policies of the transit company and has been the largest single influence in the making of contracts and leases burdensome to the City of Philadelphia. Restoration of earnings to the Philadelphia Rapid Transit Company and freedom from underlier domination will make it possible for the directors of the Philadelphia Rapid Transit Company to enter into leases with the City of Philadelphia which can effect an ultimate saving of 26 cents on the tax rate of that city.

The argument advanced by the respondent corporations, that due to pending reorganization proceedings the Federal courts now have sole jurisdiction over this subject matter, is entirely fallacious. The franchises here involved emanate exclusively from the sovereignty of the State and are completely without the jurisdiction of any

190

other governmental agency. The further argument advanced by the respondents, to the effect that the doctrine of laches may here be invoked against the Commonwealth, is of no avail because there are substantial grounds for the claim that the Commonwealth had no knowledge of the circumstances forming the basis of the acts herein until the time of filing the petition.

I am convinced that the petitioner has presented a substantial question of grave public moment, proper for judicial determination.

The prayer of the petition is therefore granted.

From Frederic Ray, Harrisburg.